**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| UNITED STATES OF AMERICA | 3:04-cr-140-HRH-JDR |
| Plaintiff, | |
| vs. | <u>**RECOMMENDATION**</u> |
| | <u>**REGARDING**</u> |
| ARTHUR HOLLIS, | <u>**MOTION TO VACATE**</u> |
| | <u>**§ 2255**</u> |
| Defendant. | |
| | (Docket No. 166) |

**Issues Presented**

The Amended § 2255 Motion raises several claims of ineffective assistance of trial counsel and of appellate counsel. The Amended Motion alleges the following ineffective assistance of trial counsel claims: (1) failing to file a motion to suppress based on an alleged illegal stop of the white Dodge Dakota on December 9, 2004; (2) failed to impeach the informant witness (Shelby Ward) by failing to bring out at trial that the informant Ward had previously been involved in an assault with the defendant, and by failing to question Ward about engaging in an

illegal drug transaction while working as an informant in the Hollis investigation; (3) failing to challenge the search warrant for North Hoyt Apt #2 and for the South Bragaw apartment; (4) failing to develop evidence that the search warrants were based on false statements, omissions and misrepresentations and by not requesting a Franks[1] hearing; (5) not seeking to impeach "law enforcement [officers];" and (6) failing to secure discovery from the government and to provide it to the defendant.

Several claims raised in the Amended § 2255 Motion were waived by the defendant in the statement of issues and supplemental briefing, namely whether trial counsel was ineffective in coercing the defendant to sign an inculpatory statement; whether trial counsel was ineffective in failing to call witnesses; and whether trial counsel was ineffective in failing to argue the admissibility of evidence offered by the government under Federal Rule of Evidence 404(b). *See* Docket 186.

At the evidentiary hearing conducted November 19, 2010, before the magistrate judge, Mr. Dewey presented three witnesses, Scott Sterling, Rex Butler and Lance Wells. Mr. Sterling was called to determine when discovery was provided to defense counsel. Mr. Butler was examined primarily as to why he did not file a Franks motion. Mr. Wells was examined concerning his efforts to obtain discovery from the government and the delays he encountered in receiving it.

---

[1] Franks v. Delaware, 438 U.S. 154 (1978).

## Procedural Background

A judgment of conviction in this criminal case was entered against Arthur L. Hollis on November 9, 2005, following a jury trial in which Hollis was found guilty of Counts 1 through 3 of the First Superseding Indictment, Docket 109. Hollis was adjudged guilty of distribution of cocaine base in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A), and two counts of maintaining a drug involved premises in violation of 21 U.S.C. § 856(a)(1) and (b). Hollis was sentenced to serve 240 months on each of Counts 1 through 3 to run concurrently.

The conviction was affirmed by the Ninth Circuit Court of Appeals on June 20, 2007. See United States v. Hollis, 490 F.3d 1149 (9th Cir. 2007). A Petition for Certiorari was denied by the U.S. Supreme Court on January 22, 2008. 128 S. Ct. 1120 (2008). Related issues in Hollis's appeal include: the trial court's failure to suppress evidence, defense counsel's failure to impeach a witness, and defense counsel's failure to effectively argue a motion challenging the search warrant or to call fact witnesses at trial. Only ineffective assistance of counsel claims are presented in the pending 2255 motion.

Defendant **Arthur Hollis** filed an amended Motion to Vacate his conviction and sentence under 28 U.S.C. § 2255. Docket 166. The government filed an opposition at 169. Hollis filed a statement of issues and supplemental briefing in support of his motion at Docket 186. An evidentiary hearing was

conducted on November 19, 2010. Hollis filed a Final Argument Brief, Docket 246. The government filed its Response at Docket 247.

Hollis requested another evidentiary hearing to obtain discovery material that had been identified at the previous evidentiary hearing. An evidentiary hearing was held January 9, 2012 limited to:

> (1) Any benefit or quid-pro-quo promised the confidential informant Ward, including his potential treatment for prosecution or sentence as a result of his cooperating and/or testifying in the Hollis trial.
>
> (2) Any debriefing reports of Ward's illegal activities contained in law enforcement records limited to Ward's criminal activity occurring between April 2004 up to the time Ward testified at the Hollis trial. This relates to reports existing before the conclusion of the Hollis trial.
>
> (3) Any investigative reports of Ward regarding his drug dealing during his cooperation with the government during the investigation of other persons in the period between May and September 2004.

Agent Eliezer Feliciano, Agent Alvin Kennedy, and Shelby Ward testified. Transcript Evidentiary Hearing, Docket 262. Assistant U.S. Attorney

Bradley filed a Response to defendant's subpoena to DEA prior to that hearing summarizing materials available in response consisting of 49 pages.  Docket 263.  Hollis objected to the government's response, Docket 264, 265 particularly as to redacted items and requested an in camera review.  An ex parte hearing on the government's response was held March 13, 2012,  after the government filed a supplemental response, Docket 270.  The magistrate judge issued an order regarding the in camera review, Docket 271.  Hollis moved for production of the Sentencing Transcript and documents in United States v. Shelby Ward, Case no. 3:04-cr-116-CR.  See Docket 273, government's position at Docket 279.  An order addressing this request was entered April 13, 2012 at Docket 281.

Following additional motion practice, the magistrate judge ordered the disclosure of certain pages of the DEA documents previously withheld after an in camera review.  See Sealed Order at Docket 302.  The court allowed Hollis an opportunity to recall the DEA agents to question them on the newly released documents regarding delivery of a FedEx package containing cocaine and Shelby Ward's prosecution.  This hearing was delayed because Hollis was appointed several new counsel: attorney Meredith Ahearn, then David Nesbett, and ultimately he wanted to represent himself.[2]

---

[2] Throughout the prosecution of this case Hollis has been represented by the following attorneys: At trial by Scott Sterling, who was replaced by Lance Wells, who was replaced by Rex Butler, who was replaced by Allen Vacura for

The final evidentiary hearing was held November 15, 2012. Following that hearing defendant filed his closing summary brief at Docket 395. The government filed its brief at Docket 399. In his opening statement Mr. Dewey summarized the ineffective assistance of counsel claim against Butler as the latter's failure to file a motion to compel discovery involving the confidential informant, Mr. Ward. The defendant argues that Mr. Butler should have filed a <u>Franks</u> motion based on inaccuracies of representations made in the affidavit in support of the search warrant for the Hoyt Street address. He argues that Butler should have filed a motion to compel discovery regarding information about the confidential source (CS) in the search warrant affidavit. The CS was later identified as Shelby Ward.

The central issue in the motion to vacate is whether any of Hollis's counsel rendered ineffective assistance of counsel under the Sixth Amendment. Whether the government violated its duty under <u>Brady</u> and its progeny was not raised in the initial § 2255 motion. In the § 2255 evidentiary hearings Hollis sought

sentencing. Hollis was represented by Matthew Robinson on appeal.
        Hollis was represented in his § 2255 by Averil Lerman, FPD who was replaced by Colleen Libbey who was replaced by William Dewey, who was replaced by Meredith Appel Ahearn, who was replaced by David Nesbett who also served as stand by counsel.
        The initial Petition was filed with Hollis proceeding without counsel. January 2009. Hollis requested appointed counsel (March 2009). Except for Ms. Ahearn, the replacement attorneys were appointed after Hollis expressed his dissatisfaction with his current attorney.

to discover the existence of any <u>Brady</u> material that the government failed to provide to his trial counsel.

Hollis's trial counsel knew prior to trial that the CS was dealing crack cocaine on his own without the knowledge of law enforcement while serving as an informant. At trial, attorney Butler argued that Ward was unreliable and his testimony should not be believed.

Dewey argues that Butler should have used an investigator to perfect a <u>Franks</u> motion during trial (Transcript Evidentiary Hearing 11/19/10, Docket 238 at p.8). Dewey relies upon testimony at trial by Officer Kennedy that he never trusted Mr. Ward. Dewey argues that the government did not provide discovery from the debriefing of Ward.

Dewey also argues that one of the ineffective assistance claims is the failure of counsel to obtain <u>Brady</u> information and file a motion to compel. (Transcript Evidentiary Hearing 11/19/10, Docket 238 at p. 15). He states that trial counsel was obligated to challenge fallacies in a search warrant affidavit through a motion to suppress and a <u>Franks</u> hearing. He argues that counsel failed to acquire impeachment evidence regarding the bias of the informant Ward in past drug deals. (Tr. 17). He states that this was not an issue on appeal, because there was no <u>Franks</u> motion at issue.

Dewey established through the testimony of attorney Wells and Sterling that Brady evidence was requested, including Kyles v. Whitley material for impeachment purposes.[3] Dewey argues that because impeachment and Brady material were not timely given, two issues are presented, namely (1) whether there should have been a motion to compel it, and (2) whether such material should have been given by the government anyway.

## FACTUAL FINDINGS FROM TESTIMONY:

### A.  Representation by Scott Sterling
(Transcript Evidentiary Hearing 11/19/10, Docket 238 at p.19)

Scott Sterling was appointed to represent Hollis in December 2004.  He represented Hollis until about March 2005. As a criminal defense lawyer, Sterling has handled cases ranging from misdemeanor DUI to murder cases.  (Tr. 79).  He started handling federal misdemeanor cases in 1987 and then felonies in 1989.  He is now employed as an attorney for the State of Alaska, addressing fraud against the elderly,  a job which he essentially considers to be a civil prosecutor.  (Tr. 80-81).

Sterling read the search warrant and affidavit he received in discovery. (Tr. 26).  He inferred from the affidavit that the officer was vouching for the veracity and reliability of the Confidential Source (CS). (Tr. 29). He observed that according to the search warrant affidavit, the officers' surveillance of the CS only went to the

---

[3] Kyles v. Whitley, 514 U.S. 419 (1995).

address and not to the particular apartment.  The warrant is specific as to Apartment #2.  Sterling realized this discrepancy right away.  Sterling had no information that the CS had provided inaccurate information to officers other than as to his past drug dealing.  (Tr. 33).

Sterling was "troubled" by the fact that Hollis was charged with conduct occurring in August of 2004, but was not formally charged until December 2004.  He believed that the prosecutor should have been preparing discovery to provide to the defense before Hollis was formally charged. (Tr. 37-38). When he had received virtually no discovery by December 27, he wrote a letter to the prosecutor expressing his concern about not receiving discovery.  As part of the discovery he received a lab report addressing the quantity and identity of the substance of the alleged drugs.

The AUSA filed a discovery conference certificate on December 28, 2004. That certificate included the following statement: "United States made available discovery to the defendant on December 28 and will continue to provide other discovery as it becomes available."  Sterling did not receive all of the discovery that was given to him by the government prior to or at that conference. The prosecution filed another discovery certificate on February 23, 2005, following the superseding indictment.

Sterling assembled a discovery notebook, defendant's Exhibit B. (Tr. 39). The notebook contains all the discovery that he received prior to his withdrawal as counsel, except for CDs and videotapes that were provided. He promptly made copies right away to provide to Hollis. (Tr. 40).

Sterling wrote Hollis on December 30, 2004, providing legal advice and his initial impressions of the case after his initial review of the discovery received. The letter discussed the defendant's sentencing exposure if he were convicted and also provided some thoughts about the implications for either cooperating with the government or not in terms of a plea agreement. In his letter, Sterling described the CS as a person with a lot of legal problems who himself could face as much as twenty (20) years in jail. (Tr. 45).

Sterling filed a motion to extend the pretrial motion deadline and a motion to continue the trial in part because discovery had been delayed. Docket 16. On January 24, 2005 District Judge John Sedwick granted the defendant's motion to continue trial. The trial was continued several times until April 4, 2005.

Sterling does not recall receiving any DEA reports or information about any drug dealing activity of the CS. (Tr. 47). He stated that if he had received information about the CS involving himself in drug dealings during the time he was working for the police, this would have suggested deficiencies in the character of the CS and caused him to consider filing a motion for a <u>Franks</u> hearing. (Tr. 48). There

was no indication in the discovery provided Sterling that the CS was a person who, in unrelated investigations, provided unreliable or untruthful information to the police. During the time Sterling was counsel for Hollis, there was no indication in the formal discovery that the officer did not trust the confidential informant. (Tr. 49).

Sterling received a letter from the prosecutor that on January 11 he had met with Detective Alvin Kennedy to review his discovery request. (Tr. 50). The letter enclosed DEA-7 reports pertaining to items recovered from search warrants and from Hollis on the date of his arrest. Sterling found this delay in production of discovery very troubling. Sterling was also bothered by a sentence in the prosecutor's January 11 letter that stated that Detective Kennedy had to obtain approval from his supervisor to produce discovery. (Tr. 59). This caused Sterling to suspect that the government was concealing information.

At the request of Hollis's family, Sterling consulted Bill Bryson, an experienced criminal defense attorney, about the case. In a January 12 letter Sterling outlined the case to Bryson and stated that if the defense was successful in getting Officers Kennedy and Balega on the stand in a suppression hearing he intended to followup with a <u>Franks</u> motion and hearing. (Tr. 51). Sterling never filed a <u>Franks</u> motion because nothing in the discovery indicated to him that officer Kennedy or some other officer misled the magistrate judge (Harry Branson) in the complaint affidavit or search warrant affidavits.

Sterling also consulted with Mark Rosenbaum, who had previously worked as an AUSA in Anchorage. When Sterling withdrew from the case, he provided the succeeding attorney, Lance Wells, with copies of the letters and all the material that he had received in the case. (Tr. 52).

Sterling discussed with AUSA Russo the possible terms of a plea agreement for Hollis. Sterling met with Hollis on February 18 and discussed with Hollis what might be feasible for reaching a plea agreement (Tr. 57). Sterling opined that Hollis did not feel he had sufficient information to make an intelligent decision about whether to enter into a plea bargain. Hollis wanted to learn more about the identity of the CS (CS-1) and possible impeachment evidence for that informant. (Tr. 56-57). The government filed a Certificate of Discovery Conference on February 23 two days after Sterling's letter.

On February 2, 2005, the government obtained a First Superseding Indictment, which added two counts to the charges against Hollis. Sterling considered this to reset the clock for production of discovery and the prosecutor's duty to provide discovery to run anew. The additional charges in the superseding indictment involved maintaining a drug involved premises. The new charges did not increase the mandatory minimum sentence available.

On February 24, 2005, Sterling wrote a letter to Hollis reporting, in part, that AUSA Russo had agreed to a sentence of 121 months with no "851

enhancement" being filed.  One of the conditions of Hollis accepting that agreement was that he not file any more motions.  (Tr. 60, 112). Sterling recommended that Hollis accept the plea agreement because he felt that Hollis's exposure to a 20-year sentence was too significant. (Tr. 60).

Sterling watched the videotapes of the drug deal involving Hollis and the confidential informant.  The video portion shows a male in a car; then another person enters the car, and the two talked.  Although there is an audio recording, the video does not depict Hollis. Sterling not only reviewed the tapes and videos he received with Hollis, he also had them transcribed and shared the transcriptions with Hollis. (Tr. 85).    Sterling considered that the CS would not necessarily be called as a witness at trial.  (Tr. 65).

On February 25, 2005, Sterling filed a motion to suppress all evidence and statements (Docket 24) arguing the lack of probable cause in the search warrant affidavit based on the informant committing drug trafficking felonies while acting as an agent.  He also argued that the affidavit failed to show that Hollis was a resident of either of the dwellings.  On March 2, 2005, Sterling moved to withdraw in an ex parte application.  (Transcript of proceedings on this motion is found at Docket 126.)

Sterling believes that Hollis had three concerns that affected their attorney-client relationship.  First, Hollis believed he had not been provided with full discovery enabling him to make a fully informed decision as to whether to take a

plea or proceed to trial; second, Hollis had a different point of view, believing that a jury might agree with his assessment of a witness; and third, Hollis had concerns about whether Sterling was competent to adequately represent him.

From Sterling's point of view, he had difficulty in communicating with Hollis. (Tr. 69). Part of this problem was due to the limitations of the jail system of allowing inmates to communicate with their attorneys. (Tr. 70). This caused Sterling to confer with Hollis frequently in person because he could not reach him by telephone. He met with Hollis in person at the jail at least a half dozen times. (Tr. 82). Sterling needing to leave town also added to his difficulty in communicating with Hollis. (Tr. 71).

Sterling believed that discoverable material in the form of fingerprint reports was not produced, and he so advised the court in his motion to withdraw. (Tr. 72). Sterling opined that the "late and erratic production of discovery" prejudiced Hollis's ability to defend himself. At the § 2255 evidentiary hearing Sterling acknowledged that an attorney experienced in criminal law should file a <u>Franks</u> motion if he obtains supporting evidence during trial. (Tr. 74-75).

The search warrant affidavit disclosed that the CS had previously been convicted of a felony drug trafficking offense. It stated that the CS agreed to cooperate with law enforcement officers in hopes of mitigating his potential sentence after he was discovered to be in possession of a large amount of crack cocaine.

The affidavit stated that during the course of CS's cooperation, law enforcement determined that the CS was providing reliable information regarding the drug trafficking activities of others in Alaska.  It disclosed that law enforcement learned after the completion of several investigations, including the one described in the affidavit, that the CS was dealing crack cocaine on his own without knowledge of law enforcement.  The affidavit revealed that the CS was currently being prosecuted for that conduct, dealing crack cocaine.

The affidavit describes the controlled buy, namely that the CS was given $8,100 in pre-recorded buy funds.  The affidavit contains a description of how the control buy took place.  Paragraph 16 of the affidavit refers to the addresses of both 540 North Hoyt, #1, and then 540 North Hoyt, #2.  The search warrant was specific to Apartment No. 2, but the affidavit described the street address with no reference to an apartment number.  Sterling acknowledged the affidavit states that the affiant spoke with an employee at Dynamic Properties who advised the affiant that Arthur Hollis had rented 540 North Hoyt, Apartment #2, since July 19, 2004.

On page 17 of the affidavit there is reference to another apartment #2, where Faith Manumalo was living.  This was apartment #2 at 743 South Bragaw. During the pre-trial criminal proceedings, the trial court determined that Hollis did not have standing to challenge the search of that apartment.  Sterling was no longer

counsel when that proceeding took place. The affidavit was used for both search warrants, but there were separate warrants for the two locations.

Upon receiving discovery from the government, Sterling promptly provided Hollis with a copy of the discovery. The government produced surveillance videotape and a surveillance audiotape and then a CD, which included a telephone call relating to the alleged buy. This information was provided in discovery by the government by December 29, 2004. Sterling experienced a delay in getting the actual duplicates made of surveillance video and audiotapes. He had reviewed them with Hollis when he first received them, but he had them transcribed so that Hollis could review them himself. (Tr. 118).

Hollis wanted more information about Mr. Ward. Sterling told Hollis that in the search warrant affidavits, Agents Kennedy and Balega both admitted that Shelby Ward sold drugs while working as a CS for them. Shelby Ward's plea agreement was entered into on December 20, 2004, which was after the December 10, 2004 affidavit for the search warrants.

Sterling's advised Hollis that if he wanted to make a "deal" with the prosecution that would mitigate or reduce his sentence, he would have to become a snitch. He told Hollis that the federal government is "quite ruthless about putting people in prison who were involved in drug [sic] with no mercy and no compassion. All the negotiating leverage favors the prosecutor." (Tr. 102).

A January 11, 2005, letter from the prosecutor indicated that because Hollis had not been read <u>Miranda</u> warnings prior to the statements he gave to investigators, the United States would not introduce such statement in its case in chief at trial. (Tr. 103).

Sterling informed Hollis that the DEA laboratory analysis reports were positive for cocaine and that his fingerprints were found on various items, including packaging material seized from the car, and that other items were also seized from South Bragaw #2.

Hollis did not want to accept any plea bargain that might result in ten or more years. (Tr. 108). Sterling advised Hollis of his assessment of how he thought the CS would be perceived by a jury. He informed Hollis that both he and Bill Bryson had concluded that Shelby Ward was not a critical witness to the government's case and that even if he did testify, it was not likely that the jury would totally disregard Ward's testimony. Sterling told Hollis that his chances of winning at trial were poor. Sterling advised Hollis that he believed that any competent lawyer with federal felony trial experience with Anchorage juries would give him the same advice, but the decision [whether to enter a plea bargain or go to trial] was strictly his. (Tr. 110,113). Sterling perceived that Hollis thought he [Sterling] was coercing him into accepting a plea bargain. Sterling sent a draft letter to Hollis dated February 21 stating that

he would not send any plea proposal to the prosecutor without Hollis first approving all essential terms. (Tr. 111).

For trial purposes, Sterling considered exploring as a defense the issue of whether Hollis had been with the CS, Mr. Ward, at the time of the alleged drug buy. He also discussed with Hollis the possibility of an entrapment defense based on Ward entrapping Hollis. (Tr. 121). Hollis was advised that if he testified, the government could seek to impeach him based on being a convicted felon. Mr. Sterling believed that he was diligent and did the best he could in representing Hollis, although Hollis felt otherwise.

After Sterling's communications with Hollis deteriorated to the point that Hollis became very upset and frustrated, Hollis argued beyond what Sterling considered to be normal bounds for the situation. Sterling concluded that Hollis had lost confidence in his ability to represent him and sought to be relieved as court-appointed counsel. Hollis was also unhappy with the fact that he was in custody and not released on bail. Sterling warned Hollis that if he went to trial the government would file an "851 Notice," there would be expert testimony from the chemist who analyzed the drugs, as well as testimony from a drug investigator about the nature of the items that were found, and there would be testimony from a fingerprint expert that Hollis's fingerprints were on certain items.

### B. Representation by Lance Wells
Tr. EH 11-19-10, Docket 238 at 133

18

Lance Wells has practiced law in Alaska since 1992. He has represented defendants in about 75 federal prosecutions, most of them drug cases. He began representing Hollis in March 2005. Wells received a letter from AUSA Goeke dated April 15, 2005, stating in part that the government was providing him with all outstanding Jencks, Gigilio, and Brady materials on Friday, April 29, 2005. Trial was scheduled for May 2, 2005. The letter then sought reciprocal Rule 16 discovery materials from the defendant. (Tr. 135). Mr. Wells engaged in some plea negotiations attempting to have Hollis avoid facing an 851 notice from the government. The 851 Notice would bump his minimum mandatory from 10 years to 20 years.

Wells filed a motion to suppress and was aware that Sterling had identified a possible Franks issue. He also filed a motion for Brady materials. (Tr. 140) Hollis believed he was not receiving police reports on Counts 2 and 3, particularly addressing the incident when his vehicle was pulled over. In an ex parte hearing regarding Well's Motion to Withdraw as counsel, Hollis expressed his belief that he was not receiving discovery from the government to the extent that he thought he should.

Wells conversed with Hollis about ways of trying to get below the mandatory minimum of ten years. Since Hollis was not eligible for the safety valve he talked with Hollis about seeking a 5K departure under the advisory Sentencing

Guidelines which requires substantial information to be provided to the government. Hollis was not interested. In Wells' assessment the government's case on its face appeared to be fairly strong.

Well's paralegal was able to synchronize the video and audio tapes so that they could be reviewed virtually simultaneously. Wells told Hollis that he did not think the case looked good from a trial stand point. Wells recognized that the video did not show what allegedly took place and did not show Mr. Ward giving cocaine and receiving money. The evidence did place Hollis in the truck where the alleged drug transaction had occurred. He recognized that the audio tape addressed the counting of money. Wells was not able to play the synchronized tapes for Hollis because of constrictions on the attorney/client visitations imposed by the jail institution.

When Wells withdrew from the case, all of his documents in his file were provided to the next attorney, Rex Butler. The Jencks material that Wells received was Bate stamped and consisted of 157 pages. It included photos of the money used in the controlled buy. He forwarded this material to Mr. Butler. (Tr. 146). He also made a copy for Mr. Hollis.

Wells' motion to withdraw as counsel was based upon what he considered a complete breakdown of the attorney-client relationship. In Mr. Wells' view, Mr. Hollis was verbally abusive, hard to deal with, would become upset and

virtually enraged during their meetings at the Cook Inlet Pretrial Facility. Hollis also made derogatory comments about him . Hollis appeared particularly upset by the fact that he was still in jail. According to Mr. Wells, Hollis did not express his innocense but he just wanted out of jail. (Tr. 150).

### C. Representation by Rex Butler
(Tr. EH 11-19-10, Docket 238 at 162)

Rex Butler has been an attorney in Alaska since 1983. He is principally a criminal defense attorney and represented Hollis at trial. He has defended all types of criminal cases in state court including murder cases. In federal court, he has handled mostly drug cases. He spent about 50 hours on the Hollis case including 18 hours of trial time. After trial, Hollis wanted a different attorney and Butler did not represent him at sentencing.

Included in the Jencks Act material received by Butler was a plea agreement of Shelby Ward. Butler discussed with Hollis the potential of offering an entrapment defense. (Tr. 222) The defense at trial offered by Butler on behalf of Hollis included an effort to establish that the incident was not a controlled buy based in part on the fact that Ward had stopped at the Northway Mall en route to his meeting with Hollis. Ward had been out of sight and sound observations by the surveilling officers while he was briefly at the mall. Butler argued at trial that Ward may well have picked up the drugs at the Mall before entering Hollis's vehicle. (Tr. 169).

Inv. Kennedy initially testified at trial that Ward made no stop at the northway Mall en route to the drug deal with Hollis. The next day he corrected this testimony. There is no credible evidence that Ward obtained drugs during the northway Mall stop. The stop was made impromptu to allow surveillance officers to get in place.

Mr. Butler cross-examined Ward at trial as well as Officer Kennedy. When Officer Kennedy testified that he did not trust Mr. Ward, Butler had him repeat that response to highlight it for the benefit of the jury. Mr. Butler recognized that an experienced policeman would not inherently trust an informant but at the same time could truthfully state in an affidavit that an informant had provided reliable information. (Tr. 212). Butler understood the purpose of a Franks hearing to determine if statements made by the affiant in a search warrant are false, reckless or intentionally misleading to the judicial officer. Butler did not know exactly when or why he wrote "franks hearing" in his trial notes. He did not file a Franks motion or a motion to compel Brady material because he did not think there was a basis for a Franks hearing, and he did not know what (if anything) was being withheld from him. Butler opined at the § 2255 evidentiary hearing that if he were aware at trial that Ward had been dealing drugs at the time he was working for the government he

would have cross-examined Ward on that issue. Butler had no independent recollection about whether such cross examination occurred. (Tr. 177-178).[4]

## Discussion

### A.    Standard for Ineffective Assistance of Counsel

Strickland v. Washington, 466 U.S. 668 (1984) establishes a two prong test for determining whether counsel has rendered constitutionally ineffective assistance of counsel. Essentially the defendant must show that his attorney's representation was deficient and that this deficiency was prejudicial. Id. at 693. The burden is upon the defendant to establish that his attorney's performance was "so deficient that it fell below an objective standard of reasonableness." Silva v. Woodford, 279 F.3d 825, 836 (9th Cir. 2002). Strickland teaches that judicial scrutiny of a counsel's performance is highly deferential and the court should make every effort to eliminate the distorting effect of hindsight and to evaluate the conduct from counsel's perspective at the time. 466 U.S. at 689. There is a strong presumption that counsel's conduct falls within the wide range of reasonably professional assistance. Id.  To establish prejudice the defendant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Strickland, at 694. A reasonable

---

[4] Butler did cross-examine Ward about his dealing drugs in violation of his informant's agreement with the government.

probability is one "sufficient to undermine confidence in the outcome." Id.  Thus, the defendant must show more than an error that could conceivably have some effect on the outcome of the proceeding. Because the defendant must prove both deficient representation and resulting prejudice, the court may address either or both prongs in determining the motion to vacate premised on such grounds. The court need not determine whether counsel's performance was deficient if such alleged deficiency could not have resulted in prejudice under the test.

### B.     Standard for **Brady** Violation

The law requires the prosecution to produce Brady and Giglio material whether or not the defendant requests any such evidence.  Strickler v. Greene, 527 U.S. 263, 280 (1999); United States v. Agurs, 427 U.S. 97, 107.

Due process imposes an "inescapable" duty on the prosecutor "to disclose known, favorable evidence rising to a material level of importance." Kyles v. Whitley, 514 U.S. at 438. Favorable evidence includes both exculpatory and impeachment material that is relevant either to guilt or punishment. See United States v. Bailey, 473 U.S. at 674–76; Giglio, 405 U.S. at 154. The prosecutor is charged with knowledge of any Brady material of which the prosecutor's office or the investigating police agency is aware. See Young blood v. West Virginia, 547 U.S. 867, 869–70 (2006) (per curiam).

A Brady violation has three elements. Strickler, 527 U.S. at 281–82. First, there must be evidence that is favorable to the defense, either because it is exculpatory or impeaching. Id. at 281–82. Second, the government must have willfully or inadvertently failed to produce the evidence. Id. at 282. Third, the suppression must have prejudiced the defendant. Id.

A Brady violation is the willful or inadvertent failure of the prosecutor to disclose evidence favorable to the defendant. See Strickler, 527 U.S. at 281–82; Giglio, 405 U.S. at 154 ("[W]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor."). Courts have long held that the government has a Brady obligation "to produce any favorable evidence in the personnel records" of an officer. United States v. Cadet, 727 F.2d 1453, 1467 (9th Cir.1984). A defendant doesn't have to make a request for exculpatory or impeachment evidence: "[T]he duty to disclose [exculpatory] evidence is applicable even though there has been no request by the accused, and ... the duty encompasses impeachment evidence as well as exculpatory evidence." Strickler, 527 U.S. at 280. Any evidence that would tend to call the government's case into doubt is favorable for Brady purposes. See Strickler, 527 U.S. at 290.

To find prejudice under Brady and Giglio, it is not necessary to find that the jury would have come out differently. Kyles, 514 U.S. at 434. It suffices that there be "a reasonable probability of a different result" as to either guilt or penalty. Id.

Prejudice exists "when the government's evidentiary suppression undermines confidence in the outcome of the trial." Id.

### C.    Exculpatory and Impeachment Evidence

Hollis argues in his § 2255 motion that Officer Kennedy's vouching for the confidential informant's reliability in his affidavit for the search warrant was contradicted by the Officer's testimony at trial that he did not trust Ward.  The officers' testimony was not contradictory.  According to the search warrant affidavit law enforcement had determined that the CS (Ward) was providing reliable information regarding the drug trafficking activities of others in Alaska.  Docket 27, Exhibit A, p.15. All confidential informants by nature are suspect and for this reason the government used surveillance and corroboration for the events that occurred using Ward as an informant in an undercover investigation.

Hollis is essentially arguing that Butler rendered ineffective assistance of counsel in his cross-examination of Ward.  Hollis seeks to boot strap his argument by arguing that the government should have provided Jencks/Brady material about Ward having been arrested in June 2004 for three separate sales in April and possession of 145 grams of crack cocaine.


Mr. Dewey requested an opportunity to call Officer Kennedy as a witness to find out how much he knew about the reliability of the informant.  Dewey

Claimed to have seen only "partial" police reports. He argued that the Jencks Act material furnished the defense included no reports on the three separate instances of the CS. (Tr. 224) Dewey stated his willingness for the court to perform an <u>in camera</u> inspection. He stated he was not seeking to add any issue to the § 2255 petition. The additional testimony, he stated, would address the failure of trial counsel to obtain <u>Brady</u> information from the government or information that was useful as impeachment material to supplement the Jencks Act material furnished. (Tr. 225) Dewey stated that he was asking for information that would have been available to the defense prior to trial. (Tr. 226).

As a predicate for taking additional testimony Dewey referred to the Jencks material furnished Hollis's trial counsel that referenced three separate occasions of drug dealings of the CS but no police reports were provided. He stated that the CS was debriefed both prior to the Hollis incident and after the CS (Ward) was discovered selling drugs in September.

Mr. Dewey argued that their "should have been more litigation on that issue [Ward] selling drugs to Harrison who sold them to another confidential informant once the Jencks Act material was produced." Tr. 227. Dewey also relies upon the lack of reference in the Jencks material to Ward stopping at the Northway Mall on the way to meet Mr. Hollis. He sought the opportunity to question the officers and prosecutors in order to avoid a miscarriage of justice and as a

precaution to see if their was other discovery that was not disclosed. Tr. 119. He relied upon the prosecutor admitting that their records have been destroyed as casting suspicion that the government has something to hide as to exculpatory information not provided.[5]

Hollis argues that in order to "successfully" claim that Butler was ineffective for not moving to compel <u>Brady</u> material, "he first needs to establish that such information exists." Docket 234, p.7. The defendant has had an opportunity to examine under oath his trial counsel concerning what materials were or were not provided to them. Hollis has already examined his attorneys as to what Jencks Act material was disclosed concerning the reports of Ward's activities in drug dealing in 2003 and 2004. Mr. Butler had a copy of Officer Kennedy's affidavit at trial and could have filed a <u>Franks</u> motion to suppress during trial if he had wanted to do so. Failure to do so did not constitute ineffective counsel.

At the November 19, 2010, § 2255 evidentiary hearing, Dewey asked a number of hypothetical questions of Butler about whether he would have wanted to receive certain materials about the informant or use information that was inconsistent with the officer's trial testimony or search warrant affidavit.[6] See for

---

[5] In his statement to the court on November 19, 2010, he refers to the government "destroying evidence." (Tr. 230).

[6] Mr. Dewey claims that some of his hypothetical questions were asked as a preliminary matter to make sure the attorney understood the law. Tr. 196. 199.

example, hypothetical questions asked at Tr. 188 and Tr. 191. Not surprisingly, Mr. Butler indicated that he would have used such information if it were available. Mr. Butler's response does not give rise to the right of Hollis to conduct a fishing probe of the government's files to see if such information might exists.

Mr. Butler acknowledged that he had not filed a motion for <u>Brady</u> material that was being withheld because he did not know of any such material being withheld. (Tr. 193). The entirety of officers reports are not discoverable prior to trial under Federal Criminal Rule 16. Mr. Butler researched the issue of the lack of police surveillance and the legality of the search that the officers performed on the motorcycle. (Tr. 198-199).

### D. Discovery Obtained at the § 2255 Hearing

Ward testified at trial that he was selling cocaine during the time he was conducting drug deals for the government during the summer and fall of 2004. Tr. 2-65. In the search warrant affidavit Officer Kennedy stated that law enforcement had learned after the completion of several investigations including the one described in the affidavit that the informant was dealing cocaine on his/her own without the knowledge of law enforcement. Affidavit, pp. 13-14, Exhibit B, at the evidentiary hearing.

Based upon the defendant's initial showing, the magistrate judge denied the defendant's request for an evidentiary hearing to obtain discovery. Docket 240.

Upon a further showing by Mr. Dewey, the magistrate judge granted his request for an in camera review of documents.  *See* Docket 266 (Order for Government to Produce Documents In Camera) and Docket 271 (Order concluding that documents reviewed in camera need not be produced to the defense by the government).

The magistrate judge ordered the in camera review based upon the following: (1) Brady imposes an obligation on the government to provide exculpatory information to the defendant whether requested or not; (2) the government indicated earlier in these post conviction proceedings that it had destroyed its file in this case; (3) that the evidence adduced at the § 2255 evidentiary hearing construed most favorably to the defendant suggests that their might have been additional unproduced Brady material on the matter of Shelby Ward's drug dealings outside his agreement with the government as an informant in the Hollis case.  Mr. Dewey requested that the court allow an in camera inspection of all Brady and impeachment material that the government had in its possession prior to trial as well as any reports on the three prior occasions of drug dealings of Ward.

After the court's ruling, Hollis moved for reconsideration at Docket 299, in which he explained that a drug transaction involving 332 grams of crack-cocaine attributed to the CS (Mr. Ward) was particularly relevant because it would have exposed Ward to a mandatory minimum sentence, which the government apparently overlooked as part of its quid-pro-quo, in exchange for Ward's testimony against

Hollis.  For reasons explained in a sealed order granting in part and denying in part defendant's motion for reconsideration the magistrate judge directed that certain pages of the Drug Enforcement Agency (DEA) documents be disclosed to counsel for the defendant and that Hollis be allowed to recall the DEA agents who previously testified at the evidentiary hearing for additional questioning limited to the FedEx package referenced in the described documents.  *See* Order at Docket 302.

In an evidentiary hearing conducted November 15, 2012, the DEA agents who previously testified at a § 2255 evidentiary hearing were recalled for questioning limited to an examination relating to documents recently released to the defendant, including the topic of a FedEx package referenced in a report of the investigator dated December 11, 2003, pages released on June 26, 2012 ordered at Docket 302, and documents referencing cocaine seized from Ward's residence on May 15, 2003.  There were also papers from Anchorage Police Department Case 03-16472, where Ward provided crack cocaine to a subject who sold crack to an undercover officer as well as a package picked up at Cheyenne Auto Parts at 5910 Arctic on September 4, 2003.

Investigator Kennedy testified that the owner of Cheyenne Auto Parts went with law enforcement to FedEx to attempt to pick up a package for delivery but it had already left FedEx's warehouse.  Eventually, the package was delivered and law enforcement officers conducted surveillance to see where it was headed.  The

package was addressed to Harold Rudolph at Cheyenne Auto Parts. It contained an alerting device allowing law enforcement to follow the package back to a residence in East Anchorage. The officers waited for the alert tone to let them know the package had been opened but that did not happen.

Officers surveilled for a day and a half the young lady who had picked up the package. The officers decided to make contact with her and she told them that Shelby Ward had asked her to pick up the package for him. She claimed Ward had told her the package contained parts for a Mustang when in fact the package contained about 300 grams of powder cocaine. Investigator Kennedy was not able to tie these drugs directly to Shelby Ward. Thus, the case was not referred to either the district attorney's office or the U.S. Attorney's office for prosecution. Mr. Ward had been in jail during the time the package was delivered.

Kennedy was able to charge Ward with cocaine seized from his residence on May 15, 2003. This investigation resulted in an indictment and conviction. There was a prosecution of Ward for an incident in which Ward had provided crack cocaine to someone who then sold it to the police. This was Anchorage Police Case No. 03-16472. Kennedy explained that another officer had a warrant for Ward and they went to his residence. This is when they seized cocaine from Ward's residence on May 15, 2003. This is the case Ward "was working off" when he cooperated in the investigation against Hollis. Docket 361, p.32.

At Hollis's trial, Butler made extensive inquiry into Ward's prior drug trafficking offenses where Ward had conceded that he had trafficked in kilo quantities of cocaine. Ward was cross-examined at Hollis's trial about the cocaine seized from Ward's residence on May 15, 2003. Ward began cooperating with law enforcement before he was released from his probation violation and after the officers had searched his residence for the probation violation. (Tr. Docket 361 at 40. The warrant of arrest was issued by magistrate judge Harry Branson dated June 18, 2004. Kennedy was cross-examined by Hollis [Tr. Docket 361 at 25] as to why it took two months for Ward to be arrested on that charge in Case No. 03-16472. The Investigator testified he had no idea why it took that long. The evidence does not disclose any prosecutable case that the investigators withheld from the prosecutors while Ward was cooperating in investigation against Hollis.

In the Harrison case Carlos Harrison (and Shelby Ward) were charged in a criminal complaint in 04-mj-180-JDR. Harrison was subsequently indicted (without Ward) in 05-cr-017-JKS, entered a plea of guilty and subsequently sentenced in August 2005. This case along with several other matters were presented to the U.S. Attorneys office for disposition. The Harrison case was prosecuted. There is no evidence to support Hollis's argument that this [Harrison's] prosecution was declined as consideration for Ward's cooperation in the Hollis case.

A defendant on court supervision is not permitted to possess controlled substances by the terms of probation or supervised release. Prosecutors sometimes seek the permission from the supervising judge to permit the defendant technically to violate this standard by participating in a drug investigation. The purpose of this permission is to protect the defendant from being subject to allegations that he's violating the terms of release by engaging in drug transactions.

During the time Ward was cooperating with the officers while on probation, the officers were required to obtain permission from the court to use him. Judge Fitzgerald signed an order on June 18, 2004 granting this permission for 60 days. Judge Fitzgerald signed an extension order dated August 20, 2004. Hollis complains that Kennedy used Ward on August 18, 2004 to make a controlled buy although the initial order granting the court's permission had expired. August 18, 2004 is the day that Ward bought drugs from Hollis. Tr. Docket 361, p.57. The date on the extension reads August 23, 2004. Kennedy testified that the probation office told him that Ward was approved by the judge to work with them.

When officers are working with an informant who is on probation and the time limit authorized by the court is about to expire, the officer calls probation and tells them that they are not through working with the individual and need more time. Kennedy was not aware that there was any lapse of time between the original authorization and the extension granted by Judge Fitzgerald. A fair understanding

of the evidence is that the court did not consider there to be a hiatus and there was nothing for the U.S. Attorney to report to Hollis's defense counsel concerning the permission of the court for Ward to be excused from his probation conditions because he continued to cooperate with law enforcement.  Since neither the prosecutor nor law enforcement believed that such was the case there was no material misrepresentation or gross negligence on their part in failing to disclose this information to the defense since arguably the court extension picked up where the initial 60 days left off.  This hiatus in the two orders granting permission, if that indeed did occur, did not violate any of Hollis's rights.  Thus, he lacked the basis for challenging that occurrence even if it had been earlier disclosed by the government.

### E.    Undisclosed Memo

The parties dispute the significance of the September 1, 2004 Memorandum documenting a meeting on August 30, 2004, among Task Force Officer Al Kennedy, ATF Special Agent Rebecca Bobich, and Assistant U.S. Attorneys Frank Russo, Stephan Collins and Joseph Bottini.  The memo reveals that agents had received drugs from another cooperator who alleged that they had purchased 22 grams of crack from Ward.  This allegation was not corroborated by any police controls or surveillance.  The allegation was made after Ward had purchased crack from Hollis that resulted in the instant prosecution.  The memo was

prepared by Kennedy and placed in the informant's file at DEA. The memo was discovered during the pendency of the present habeas proceedings, and produced. The United States concedes that this memo and the information contained therein should have been produced prior to trial. AUSA Goeke, who was not present at the August 30 meeting, took over the Hollis prosecution and apparently never saw the memorandum.

The contents of the memo are overstated by Hollis. He argues that Kennedy determined that the police should no longer work with Ward or accept his cooperation. This is incorrect. The memo acknowledges that Ward was no longer a reliable source but described how the DEA could work with Ward and that his information should be corroborated.

The fact that Ward was dealing drugs on the side and was deemed untrustworthy was addressed by trial counsel. The jury heard impeachment evidence even though the memo had not been disclosed. Kennedy testified at trial on direct examination that when he learned from another informant that Ward was allegedly selling crack cocaine, he notified the U.S. Attorneys office and then continued to complete the deal with Ward. Trial Transcript, Docket 1-69. Kennedy detailed a controlled buy made from Ward in September 2004, after Ward's drug deal with Hollis but before Hollis was arrested.

On cross-examination at trial, Kennedy discussed Ward's sale of an ounce of crack and the fact that Ward was charged with the crime and had pled guilty. Trial Transcript, Docket 121 at pp. 2-29. Kennedy testified that he told Ward "[i]f he violated what I asked him to do, if he was out committing other crimes, that I would catch him, and – and I did." *Id.* at 2-30. Even Ward himself admitted at trial that he was selling drugs the entire time he was assisting authorities.

Inv. Kennedy testified that Ward was a dope dealer and had been one for as far back as he could remember. Kennedy agreed with Butler's assertion at trial that Ward could not be trusted. *Id.* at 1-86-87. When Kennedy was asked by Butler if Ward had promised Kennedy not to sell cocaine and had broken that promise, Kennedy stated "Oh, without a doubt." *Id.* at 1-89. Kennedy's distrust of Ward as an informant was extensively probed at trial.

At trial, Butler asked Ward if he would lie to avoid another federal prison sentence. Ward testified: "Probably, Yeah." Trial Transcript, Docket 127 at pp. 3-109. Butler then asked, "If you could get away with it, you would, right?" Ward replied, "Probably." *Id.* The topic of Ward's double dealing and untrustworthiness were explored extensively at trial by both the prosecutor and the defense attorney. There is nothing that the memo could have added as persuasive impeachment. Thus, there was no prejudice to Hollis in receiving a fair trial. The failure of the government to produce the impeaching information did not prejudice Hollis under

<u>Brady</u>.  Hollis has not been prejudiced by his attorney not obtaining the information prior to trial.

### F.     Ward's Stop at Northway Mall

Inv. Kennedy initially testified at trial that he believed there was no stop made by the CS (Ward) at the Northway Mall because he did not have a note of such in his reports.  The officer corrected his testimony the next day at trial, testifying that he believed the CS did stop at the Northway Mall because that was stated by Mr. Ward in his debriefing.  (Tr. 203).

At trial Butler explored the un-surveilled stop by Ward en route to the meeting with Hollis where the defense alleged that Ward could have obtained drugs used to "set up" Hollis.  The manner of surveillance of Ward was covered on both direct and cross-examination of Kennedy.  The jury had the benefit of the audio and video surveillance tapes documenting the deal between Hollis and Ward as well as tapes of the phone calls setting up the cocaine sale.  This argument has been examined extensively at trial and during the post-trial proceedings.  The police monitoring of Ward during his unauthorized stop prior to meeting with Hollis was a factual matter amply explored at trial.  The government must accept the facts of the case as they occurred and an unexpected stop by Ward created a factual issue not a basis for dismissal of the case.  Hollis has not identified any aspect of this scenario that constituted a <u>Brady</u> violation.

The matter of Ward stopping at the Northway Mall on the way to meet Mr. Hollis was sufficiently probed at trial by Mr. Butler to satisfy the Sixth Amendment standard. At trial Officer Kennedy was examined as to why police reports did not mention the stop at Northway Mall. See Cross-Examination of Kennedy Tr. 2-10. The trial testimony shows that notwithstanding the impeachment efforts by defense counsel, the veracity of Ward concerning the Hollis transaction was corroborated by officer surveillance.

### G.     Benefits Given Ward for His Cooperation

Hollis argues that Ward received undisclosed benefits in exchange for his cooperation against him. Ward testified that AUSA Frank Russo promised him that he would not be charged with any crimes if he cooperated with Inv. Kennedy. Based on Russo's testimony at the same hearing as well as Ward's testimony at trial, the court finds that the government did not promise Ward any undisclosed benefits in exchange for his cooperation.

The prosecution actually argued for 100 months of imprisonment at Ward's sentencing, (Docket 262, p.156), which is less time than he received. Ward was not charged with any offense relating to the package of cocaine delivered to Cheyenne Auto Parts while he was in jail in September 2003 nor was he charged with the 22 grams of crack provided to Kennedy by another informant in late August 2004. The latter drugs were provided to police by an informant who obtained them

in an uncontrolled deal allegedly from Ward.  The fact that Hollis's attorney(s) was not advised of these uncharged allegations against Ward did not prejudice Hollis at trial nor do they evidence any undisclosed benefits allegedly provided by the government to Ward.

### H.    Alleged Prosecutorial Misconduct

Hollis claims that his attorney was ineffective for failing to allege prosecutorial misconduct.  He claims that Butler should have moved for a mistrial or a new trial based on the theory that other Brady material had to exist and was suppressed by the government.  The defendant offers only speculation that his attorney should have taken such action.  He offers no evidence or arguments to support this claim.  Butler would have had to do more than raise that issue before the trial court in order to prevail.

The fact that Ward had been charged and convicted of drug trafficking was brought out in the trial.  Tr. 2-19.  It was also brought out at trial what Ward had been promised and not promised in exchange for his testimony.   The record also shows that Butler was on notice of Ward's extensive drug dealing activities and the existence of reports of said activities.

Mr. Butler could have asked the government if there were additional reports about the informant's recent drug trafficking.  Mr. Ward could have been questioned more about the topic.  The fact that Ward had been charged and

convicted of drug trafficking was brought out in the trial.  Tr. 2-19.  It was also brought out at trial what Ward had been promised in exchange for his testimony.

## I.   Alleged Failure to Secure Discovery

At trial, defense counsel sufficiently probed Ward's deceptive behavior in dealing drugs while cooperating with law enforcement during the Hollis investigation.  Hollis has not shown that he was prejudiced by his trial attorney's failure to seek additional discovery regarding the informant.  Defense counsel had police reports of Ward selling drugs about a month after the alleged sale for Hollis as well as the plea agreement Ward entered into dated December 20, 2004 and information about Ward's September 27, 2004 sale of cocaine to another undercover agent.  Possession of the police report and audio recordings involving the informant were sufficient to permit Mr. Butler to conduct an adequate cross-examination of Ward and argue to the jury Ward's lack of credibility.  Considering the information that Mr. Butler had obtained, it did not constitute ineffective counsel not to seek further discovery or impeachment evidence.

## J.   Franks Hearing

Hollis argues that his trial counsel, Rex Butler, was ineffective because he failed to argue for a Franks hearing seeking to suppress the fruits of the search of the 540 N. Hoyt #2, Anchorage, Alaska.  In his affidavit for that search warrant No. A04-330 MJ,  Inv. Kennedy asserted that during the investigation the informant had

provided reliable information regarding drug trafficking. In the next sentence Kennedy states: "Law enforcement, however, learned after the completion of several investigations, including the one described in this affidavit, that the CS was dealing crack cocaine on his/her own without the knowledge of law enforcement. For this conduct, the CS was charged with dealing crack cocaine and is currently being prosecuted for that conduct." Search Warrant Affidavit, p.13-14.

Hollis faults his attorneys for not seeking an evidentiary hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978) to determine whether the affidavit submitted in support of the search warrant for North Hoyt Street was deficient because it contained a material omission and/or misstatement. Mr. Butler was not constitutionally ineffective as counsel in failing to move to suppress evidence based upon a Franks showing because the defendant could not meet the requirements of specificity for purposes of requesting a Franks hearing.

Hollis argues that Butler should have sought a Franks hearing after Kennedy testified that Hollis was not connected to the apartment of 540 N. Hoyt by surveillance on August 10 or thereafter. Hollis was present at apartment #2 when evidence was seized pursuant to a search warrant. The search warrant affidavit connected Hollis to the apartment at 540 N. Hoyt with the following language:

On December 9, 2004 surveillance observed Hollis drive

into the driveway of 540 N. Hoyt but not go inside. Hollis

continued to use evasive measures after leaving 540 N.
Hoyt, then returned [there] and went inside for a brief
period of time. Hollis when arrested that day stated he
lived at 540 N. Hoyt. Law enforcement later executed a
search warrant at this address and did not find any
evidence or documents tying this location to Hollis. After
this search, Kennedy spoke to an employee at Dynamic
properties, who advised [him] that Arthur Hollis had rented
540 N. Hoyt, apartment #2 since July 19, 2004. Docket
27, Exhibit A, pp. 5-116.

Hollis has not identified any false, misleading or omitted information to entitle him to
a Franks hearing.

Butler wrote in his trial preparation papers "Franks." He testified that he
did not know if he wrote that before or after trial. Tr. 192. It could have been written
as a result of reviewing Sterling's papers because Attorney Sterling suggested
consideration of a Franks hearing.

In Franks v. Delaware, supra, the Supreme Court addressed whether
a false statement by a government affiant invalidates a search warrant. The court
held that a defendant is entitled to a suppression hearing only upon a substantial
preliminary showing that a governmental agent intentionally or recklessly made false

statements necessary to the finding of probable case. 438 U.S. at 171. This principle has two assumptions: (1)"misstatements resulting from negligence or good faith mistakes will not invalidate an affidavit which on its face establishes probable cause." United States v. Smith, 588 F.2d 737, 740 (9th Cir. 1978); and (2) even if the affiant's statements are made intentionally or recklessly, such statements will not invalidate the entire warrant provided "there remains sufficient content in the warrant affidavit to support a finding of probable cause." Franks, 438 U.S. at 172. The Franks court emphasized a strict requirement of proof finding that "[t]here must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." Id. at 171.

Aside from the credibility of the informant, the affidavit for the search warrant was based primarily on the police officer's own observation of the controlled drug transaction between Hollis and the witness and the surveillance of Hollis's subsequent movements which led them to the North Hoyt apartment. See United States v. Hollis, 490 F.3d 1149, 1153 (9th Cir. 2007). The fact that the officers' surveillance led to an alley way at North Hoyt rather than to the door of Apartment No. 2 was not a significant distinction to undermine the probable cause shown in the affidavit. The judicial officer issuing the search warrant was not misled as to the credibility of the informant since the affidavit disclosed the informant's involvement in drug dealing during the time he was cooperating.

**Conclusion**

The evidence does not support the claims of ineffective assistance of counsel presented in the Motion to Vacate as amended. The defendant's trial counsel was not constitutionally ineffective regarding motions to suppress evidence including not requesting a <u>Franks</u> hearing, or impeaching the confidential source, Shelby Ward. The Motion to Vacate should be denied. IT IS SO RECOMMENDED.

DATED this 9th day of July, 2013, at Anchorage, Alaska.

*/s/ John D. Roberts*
JOHN D. ROBERTS
United States Magistrate Judge

Pursuant to D.Ak.L.M.R. 6(a), a party seeking to object to this proposed finding and recommendation shall file electronic objections with the Clerk of Court no later than **NOON on July 24, 2013**. The failure to object to a magistrate judge's findings of fact may be treated as a procedural default and waiver of the right to contest those findings on appeal. Objections and responses shall not exceed **five (5) pages** in length, and shall not merely reargue positions presented in motion papers. Rather, objections and responses shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points and authorities in support. Response(s) to the objections shall be filed on or before **NOON 7/31/2013**. The parties shall otherwise comply with provisions of D.Ak.L.M.R. 6(a).

Reports and recommendations are not appealable orders.  Any notice of appeal pursuant to Fed.R.App.P. 4(a)(1) should not be filed until entry of the district court's judgment.  <u>See</u> <u>Hilliard v. Kincheloe</u>, 796 F.2d 308 (9th Cir. 1986).